Mr. Clerk, call the next case, please. You've got a little audience here. Case number 07-2253, People v. Juan Luna. Okay, if the Council could approach. State your names and let us know who you represent. Good morning. My name is Kathy Flynn from the State Appellate Defender representing Juan Luna. Good morning, Your Honor. Assistant State's Attorney Alan Spellberg representing the People. Okay, normally we're 15 and 15, but there are a lot of issues in this case, so we're not going to be particularly irritating time-wise. But in other ways, you can rest assured. We'll be irritating in many other ways. In order to be consistent, we must. Okay, thank you very much. And keep your voices up today if you could. Good morning. As I just said, I'm Kathy Flynn from the State Appellate Defender's Office. Today I was planning on concentrating on the challenges to the palm print and the DNA evidence submitted against Mr. Luna, but of course I'm happy to answer questions on the other issues as well. Latent print identification has been admissible in Illinois since 1911 when Jennings was decided. In the ensuing years, courts have basically followed suit, but the landscape has changed. Scientists, statisticians, and other disinterested academic scholars who have taken a hard look at print identification have concluded that it cannot accurately and reliably connect a latent print, a print from a crime scene generally, much less a palm print to a particular person. It's time to have a first-ever Fry hearing in Illinois on the general scientific acceptance of print identification. Do you have specific cases where they've changed its position? You're making the generality that things have changed, but what do you have to back it up specifically? In terms of what has changed, scientists have begun to look at the claims made by latent print. Do I have a case? I do have a circuit court case from Maryland, State v. Rose, in which case- It's unreported, right? It is unreported. It is, however, a Fry jurisdiction, which incidentally- which after a thorough hearing led to exclusion of the- I believe that was a fingerprint in that case. Ms. Klein, do you have a case where- I mean, you're basically saying that one of the attorneys or the attorneys in total, including an attorney who has made basically his career doing the scientific evidence, was ineffective for not asking for a Fry hearing. Do you have any cases that hold that the failure to ask for a Fry hearing on fingerprint, palm print, identification, testimony, is error? Well, just to be clear, the ineffectiveness claim is only vis-a-vis DNA. Right. Mr. Sinkox did ask for a Fry hearing on the admissibility of the palm print. I'm sorry, I misspoke. And that was at least argued below. I know, but I think the regular rubric from Strickland v. Washington would apply. Simply, is there merit? From the record, can we say is there potential merit to the claim? And if so, would it have been successful? And the other question that that raises, of course, is where this type of evidence in total has been excluded because of its lack of reliability. I'm sorry, I didn't quite get that. The testimony of a palm print examiner or a fingerprint examiner has been excluded because of its unreliability. Right, and that was going to happen in State v. Rose, but after that evidence was excluded, the State promptly dismissed the State law charges. They charged him federally, and it was then admitted under Dawbert. However, as I was getting back to your point that you initially made, the landscape has changed because the broader scholarly community, not just print examiners, have really started to take a look at fingerprints. Now, these objections were known at the time of trial, and they have since really reached their peak in the issuance of a 2009 report by the National Research Council. Now, their conclusions are startling, and I just wish to preface this by saying that this is not a fringe organization. The National Research Council is headed up by a retired federal judge. They had statisticians. They took opinions from the forensic community as well as academics, and they came to several startling conclusions. They state flat out that print identification, known as ACEV, I can see from the previous case you're familiar with that, has not been rigorously shown to be able to consistently and accurately demonstrate a connection between evidence and a specific individual. What about eyewitness identification? I would argue as well that New Jersey just agreed that that's similar. On whether or not somebody could identify someone reliably? Isn't it all within the realm of the weight to be ascribed to the opinion testimony given either by an eyewitness in an eyewitness case or a psychiatrist in a case where that happens to be pertinent information or the fingerprint examiner? And in a case where there is a question raised as to whether there is a match and if there is a match, whether the match is significant, isn't that a battle for experts to wage in front of the trier of fact? It should actually be a battle of experts initially in front of the trial court, the trial judge. I mean, FRI requires some kind of baseline reliability in the form of general acceptance in order to put certain evidence before a jury. And there's a particular risk, especially with scientific evidence such as fingerprint, I mean, as held in Stafford. I mean, juries really believe that this stuff is very reliable. And as I've said before, the trier of fact in this case, Judge Gahan, needed to have a FRI hearing to determine if that was indeed the case. The kind of cured by cross-examination remedy was explicitly rejected by the Illinois Supreme Court, like in McCown and Baines, in which they said, you know, HGN just isn't reliable enough. We have to have a FRI hearing on it. Same with polygraph. Jurors are not sophisticated to be able to sort this out and make a reasoned conclusion as to its reliability. That's something the judge has to do. And drawing a distinction between fingerprint and palm print has been sort of the tack you take in your briefs. Can you tell me why that distinction is so important to require a FRI hearing in this type of a case? Sure. And before I start, I want to note that the case is cited by the state in its brief regarding palm prints. The parties in those cases generally just stipulated that fingers are the same as palms, the same principles apply, the same law applies. We certainly are not making that claim here, as you've noted. Of course, the same objections that we've raised to, you know, fingerprint identification are equally applicable to palms, and even more so. Palms are more exotic than fingerprints. I mean, they're not as often encountered. Just prosaically, palms are big. I mean, it's one thing to say that you can get a certain amount of information from, you know, a decent patch of someone's fingertip. It's quite another thing to say that a tiny piece, and in this case we're talking about something half the size of a postage stamp from right here on the palm, that that can't be matched to anybody else's palm in the entire world. And that was precisely what John Onswetter's testimony was. And by the way, I should also point out that this particular print was not identified as coming from a hand until after Juan Luna was arrested, and the fingerprint examiner also knew about that. And they had his prints from 10 years before, but they didn't have the left palm. Yes, that was rather interesting how suddenly the officer whose sole job it was to interview ex-employees and take their full finger, left and right finger and palm prints, all of a sudden was missing Luna's left palm print. Should that impact us in our deliberations? I think it should give you some kind of healthy skepticism about the reliability of ACEV. I mean, if Onswetter claims he's an experienced and certified print examiner, claims he's never made an error, you know, there's no evidence in the record that the absence of this left-hand palm was ever noticed by anyone. You know, I think it's entirely possible that someone had reviewed it and just didn't find a match. But there's certainly no evidence of that. No, there's no evidence of that. But what are the chances that of all the palms from all the people they interviewed, exactly his would be missing? I'm just saying. Okay. To return to the point, how are palms different from fingerprints? Sir, in the front row, if you can't control your physical gestures, maybe you should leave. Because I have to look right at you as I'm looking over counsel's shoulder as she's speaking, and it's really distracting. Thank you. All right. Doctors Lynn and Ralph Haber, whose views were also cited by the National Research Council in the report I mentioned, they'd done an extensive survey of print identification. There are no manuals about palm print identification issued by professional, regulatory, advisory organizations, no comprehensive textbook. They were only able to find one single course on palm, you know, specifically devoted to palm print identification. They conclude that, you know, absent this information, there's simply no method to test. And Dr. Simon Cole, like I said, their affidavits are in the record as well, cited in the briefs. The validity of ACEV has never been demonstrated when used to compare latent prints to inked palm prints. In addition, there's just more information about fingerprints. I mean, the fingerprints have more or less common configurations. I heard part of a discussion earlier about the ridges, they form deltas, there's whorls, there's different things. There's just no information or very limited information of that nature about prints. If the Court has no further questions, I move on to the DNA evidence. All right. Counsel was ineffective for failing to vote for a Fry hearing on the admissibility of the DNA evidence here, a key piece of the prosecution's case. Had he done so, there's a reasonable likelihood the motion would have been successful because of the well-documented problems associated with testing substandard amounts of DNA. Could you address the argument that the State makes in its brief that basically, if I can paraphrase it and summarize it, that we're dealing with a less than complete factual record here and that maybe this is something that's better suited for a post-conviction petition where a lot of these issues, not only the one that the State raises about why it wasn't done, which may or may not be important, but also about what would have been presented in a Fry hearing by both sides could then come before a reviewing court? In thinking about that point, Your Honor, I can't really imagine a record that is better developed to raise this issue on direct appeal. It's 16,000 pages with every lab report, every validation report, deposition of every DNA expert. In fact, if I came in here on appeal from a PC, I can only imagine what the State would say. They would say, this is the longest record in history. Why didn't they raise this? This issue is evident from the face of the record. So this record, I mean, we do know several things from this record, and it's adequate for this Court to decide whether or not perhaps counsel was ineffective for failing to have a Fry hearing. Now, just by way of background, I want to discuss a bit of what happened in the testing process here. In 1998, the Illinois State Police Lab started STR DNA analysis, which is basically the technique where you can take very small amounts of DNA, amplify them, make millions of copies of them, and you can obtain a result. In the lab here, 0.6 nanograms, now a nanogram is a billionth of a gram, 0.6 nanograms is the minimum quantity of DNA required for reliable results. The amplification kit they use, Profiler Plus, that's basically the kit that makes the millions of copies of the DNA. I recommend a higher amount, between 1 and 2.5 nanograms. Now, the chicken bones, which were retrieved from the bottom of the garbage can at the Brown's restaurant, saliva, indicating the possibility of cheek cells containing DNA, were found on two bones, bone C and D. Bone C, after quantitation testing, revealed much less than 0.5 nanograms of DNA. So it's less than the Profiler Plus kit standard, it's less than the ISP's minimum standard for optimal results, and it possibly qualifies as low copy number DNA, which is generally defined as 0.2 nanograms. Bone D had less than 0.5 nanograms. So those are the two amounts we're dealing with. Because the levels were so low, the analyst, Cecilia Doyle, had to go to Dr. Pam Fish for special permission to proceed. She got the permission, and then she got a result, but the samples contained a mixture. That's undisputed here, because if you've ever looked at an electropharogram before, each person has two alleles at each locus. Here, nine were tested, not the usual standard 13. But at that point, was there even capacity to look at 13? Well, soon after, in 1999, I believe they started to use CoFiler, which provides you, but they never did test for the additional four alleles. So anyway, there was definitely a mixture of DNA here, from at least two, probably more contributors. I say that because the so-called minor profile, the small bumps on the electropharogram, were never traced to anybody, and they tested 92 different people, including a field museum ornithologist who I believe was in Mozambique at the time. They left no stone unturned. So testing of extremely low levels of DNA carry well-known hazards. They're basically, they're sampling errors. When the copying process starts, it may pick up the wrong alleles and make copies of, it may make more copies of the contaminating alleles than it does of the ones made by the true contributor. And so, for example, so it makes it look on the electropharogram like the person has only one allele at a certain locus, when really there are two, and one simply didn't show up. That's called allelic dropout. There's another issue that you have, particularly with mixtures like we have here, and low copy number DNA. Drop-ins. Drop-in, exactly, where you're amplifying the contaminating DNA, but yet it makes it look like it's part of the profile of the person you're trying to prosecute. So that's also a potential problem. The testing here was undoubtedly carried out on an amount of DNA falling below the internally validated standards by the lab, well below the amount of target DNA recommended by the manufacturers of Profiler Plus, and like I said before, it also qualifies as possible low copy number DNA. This matter would have been ripe for a Fry hearing. None has ever been held in the state of Illinois on low copy number DNA testing, or the other issue I've identified, below the internally validated standards. I'm sorry? There's never been a Fry hearing. No, but there should be, because this is really... So you wanted this to be the first. Yes, absolutely. Because of the amount that was tested. Yes. When you get down to .2 nanograms. Exactly, when you get down to .2 nanograms, or even, you know, I mean... It does sort of beg the question, though, I think, in terms of whether they were properly representing Mr. Luna, that it seems that this team of defense lawyers who were particularly talented in the scientific realm sort of relished the battle that they had to talk about how little material they had and the way the bones were handled. They're over to the museum, they're in and out of storage, and, you know, you have very little material that you're dealing with. So it seems like it was trial strategy by some pretty experienced lawyers. Well, I can't see where it would be trial strategy to try to, you know, get a Fry hearing on evidence that might potentially be excluded. Which, with us discussing this now, raises once again the issue of a post-conviction petition as a way to determine, you know, you have the almost anomalous situation where a Fry hearing is being sought on palm print identification 101 years or 100 years ago, I guess, since it was first admitted in Illinois. And then in a situation where people absolutely knew that there was an amount tested that at least was below some of the guidelines, that there was either a decision not to seek a Fry hearing or an omission. And basically what I think you would concede that if it were indeed a trial tactic, that we would have a much different case than if it was, oh, I never thought of that. Well, again, I can't see where this would possibly be a trial tactic. I mean, the DNA was a huge piece of evidence against Mr. Luna at trial. Doesn't that cut the other way, though? But how is this like any other case, really? I mean, there have been cases where this court has said based on, and by the way, the record here really just points in one direction. It's low-level amounts of DNA. We've got a mixture. There's all these problems that the briefs talk about, you know, where it could skew the results, make it look like, you know, it's Mr. Luna's profile on the elective paragraphs when it truly is not. However, how is that any different, really, from where you have a case saying that counsel is ineffective for failing to file a motion to suppress? I mean, you just have to take the record as it is. Yeah, and in this case, taking it as it is, they wanted a prior hearing on the palm print. Right. And they did not want one, or didn't ask for one, on the DNA. So it's hard for me to imagine that it is not something that was a trial strategy decision by the defense. I mean, the thing is, the record really admits of one conclusion at this point. I mean, also, I mean, I just have to point out, I mean, they might have just missed it. As formidable as Mr. Sinkock's reputation is, things get missed. The crime happened in 93, and Mr. Luna wasn't arrested until 2002. There are rooms of discovery. This was like a five-front war. DNA, palm print, you know, there's a lot of things to consider. But clearly, from the record, there was extensive cross-examination on the issue that would be basically raised in the sufficient sample to be able to rely on the conclusions. And so in preparing for that, it's very difficult for me to take the position that you're arguing, which is it just never occurred to them to challenge it, rather than maybe we're better off not challenging its admissibility, but just attacking the conclusions based upon the insufficiency of the sample, vis-a-vis the requirements of the different protocols. But, you know, they didn't attack it on the basis of insufficient amounts. I mean, the cross-examination of the DNA experts at trial centered on the fact that it's a mixture, and that, I mean, so that's part of it here. Wouldn't that be part of the Fry hearing anyway? The jury was never given the information that low copy number, insufficient numbers of input DNA, insufficient amounts of input DNA was the reason for the dropout. It was just kind of presented as this, well, maybe it happened. Gosh, you know, it's just purely as a theoretical matter. But this state of affairs actually gives you a reason why that might happen. And there's no strategic reason not to pursue that theory. Would you care to address the issue of harmless error in this context, even if we find error? Sure. There's no question that the DNA played an integral part of this trial. There were probably eight or nine DNA witnesses. Their testimony occupied the bulk of the trial, really. As this Court has already observed, I mean, DNA is extremely persuasive to juries. The state concentrated on it in closing argument. I don't think there can really be any question that DNA was integral to the conviction here. And in terms of the other evidence, I mean, there was a confession from Mr. Luna, but he wasn't the only one who confessed to this crime. No, and the confession was also corroborated by other witnesses' testimony. Well, Mr. Simonek's was, too. Of course, that corroboration was not allowed in by Judge Gahn. Simonek, like Luna, knew a lot of details about the crime scene. He knew things like that there was a bullet hole in the plastic strip hanging in front of the cooler. I mean, he said that he drove up there in a brown station wagon. There were other witnesses who said that a brown station wagon was seen in the parking lot at or near the time the restaurant was closing. He knew about the bullet hole in the fryer hood. I'm saying, both he and Luna, you know, there's some indication that they were coached in their confessions. I mean, they both used compass points, east, west, north, south. They were very cop-like ways to refer to locations of various things in the restaurant. And for that reason, I would say that in light of the way the juries give DNA evidence, the admission of this evidence certainly was not harmless. Thank you. Thank you. Good morning again. Assistant State's Attorney Alan Spelberg for the People. In answer to your question, Justice Smith, what has changed since Jennings came down in 1911? Absolutely nothing. The Illinois Supreme Court in 1911 ruled that fingerprint evidence is based upon long-standing scientific understandings, is based upon well-understood and generally accepted concepts, and is therefore admissible. And that has been the law in Illinois since 1911. It has been the law across the country since 1911. And just last year, this Court in People v. Mitchell specifically said that until the Illinois Supreme Court says otherwise, there's no reason to question that rule of law. And the reason why that makes sense and the reason why there was no Fry hearing necessary in this case is because Fry hearings are only required for scientific testimony which is new or novel. And as Jennings recognized in 1911, it is thousands of years old. But couldn't the newness or the novelty of something be encompassing new scientific discoveries or new scientific theories that evolve over time? In other words, if somebody had once said that the earth revolves around the sun and they'd been saying it for several hundred years, or excuse me, the sun revolves around the earth and they've been saying it for several hundred years, couldn't somebody else's evidence raise questions that would require a new consideration of something that had been accepted for a long period of time? Well, Your Honor, the Fry Law, as it's been developed in Illinois and really across the country, is that the existence of dissent within the scientific community doesn't demand a Fry hearing. There can be dissension. There can be disagreements. There can even be a minority view, which is the basis of the evidence which is being offered, but that still doesn't require a Fry hearing. The example that I would point to, as we said in our brief, is the People v. Swart case. But certainly there would be a standard at some point if there was not just a minority view but some line of significance and quantity of opposition to the underlying principles of some science that would require. It wouldn't have to be, quote, a new science. There can certainly be a circumstance under which a Fry hearing would be required based upon the evolution of scientific knowledge. Well, I guess the example I could point to for a situation like that would be the McCown cases, the McCown cases dealing with the HGN for the horizontal gaze nystagmus. And that was a situation where the Illinois Supreme Court first ruled when it was finally brought to them some 20 years after it had started being used and had been litigated in the lower courts. In 2007, the Illinois Supreme Court said, you know, this is still new to us. We haven't ruled upon it yet. We haven't seen it. We believe that this is questionable after looking at all of the cases across the country, seeing how everything was. And they were mandated for a Fry hearing. The Fry hearing was held, and ultimately the court held that it was generally accepted within the scientific community. But the importance there is, again, there was a significant dissension, and it was new to the court that was reviewing it. The Illinois Supreme Court was reviewing it for the first time ever in 2007. So you reject the concept that the Illinois Supreme Court, had they once reviewed HGN and found it to be, for example, not reliable, could ever look at it again based upon the evolution of scientific knowledge? No. No, that's not what I'm saying. But, again, the question about Fry, and maybe this is a question that really goes towards the defendant's third issue, which they are standing on their brief, is whether or not we're a Fry or a Daubert state. Fry is a question of general acceptance. I don't think we're going to be deciding that. No, of course, but I think it's an important understanding as to what the role of a Fry hearing is. Fry is solely a question of general acceptance. It is not a question of the reliability of the ultimate conclusions, which are reached at a particular point. And that's in the Donaldson case, which we cite in our brief, the court was very clear to not only to reassert that we're a Fry state, but to reject what had become known as the Fry plus reliability standard, which was taking Fry and then also looking at the Daubert standards. And in the example that you offered, Your Honor, where it would be looking to see if the science had developed to become more reliable, that would be a question that could develop to a new Fry. Has there been a new Fry standard to reach the point? But the reliability, as it progresses over time, as Donaldson said, as Jennings said, as Mitchell said, those are questions for a cross-examination. Those are not questions of admissibility. Do all of those fingerprint cases and their legion also stand for the proposition that evidence that you're talking about here, a little bit of the left palm print, is as persuasive, as compelling, as unique as the standard fingerprint? Well, again, Your Honor, I think from a Fry standpoint, once we're talking about friction ridge impressions, fingerprints, those same things, latent print examination, that's the science which is admissible. An expert who is competent in that is able to testify regarding those theories, those methodologies. And then whatever conclusions they reach, including whether or not the palm print which was found here, the partial palm print which was found in this case and was matched to Juan Luna, whether or not that is an appropriate testimony to be offered, that's subject to cross-examination. That's a question. But the methodology, the question of whether or not the latent print examination methodology is admissible, that's the Fry question. And that, as a matter of law, has been decided long, not just in Illinois, but across the country. And I would point out that nowhere in the country, and counsel can't identify a single published opinion in the country, finding fingerprint evidence is not admissible. And we cite a legion of cases in our brief demonstrating and rejecting these same arguments. The one decision which counsel referred to was the Rose decision, an unreported trial court decision from Maryland. But what she didn't refer to was the case that we cited in our brief, Markham v. State, which is an appellate court decision, a published appellate court decision from Maryland after the Rose decision, specifically rejecting all of those arguments. We also cite a series of cases from the federal courts, Baines, Pena, Rose, Gamora from Massachusetts. All of those cases addressed all of these exact arguments, including the National Review Counsel report. The Rose case in particular specifically identified that the National Review Counsel report was never intended to be a basis to preclude any evidence in any particular case. It's a question of we should be looking at our forensic standards, at our forensic sciences, but it's not the same as a question of what they intended. And what impact it has in the scientific community, of course, may be related, but they're not the same thing. No, of course not. But it's significant that every court that has looked at these issues has rejected it. And that's why the decision in this case to deny a trial hearing was not an abuse of discretion. It was a proper ruling because there is nothing new or novel about the methodology which was being applied by John Onswater in this case. And so for that reason, the decision was correct. In regards to counsel's second issue, I'd just like to quote something she said. Perhaps counsel was ineffective. Well, the question here isn't simply whether or not perhaps counsel was ineffective and so therefore release should be granted and a fri hearing should be ordered. The question here is whether or not counsel provided deficient representation as required by the Sixth Amendment. And under Strickland v. Washington, this court must presume that they provided proper representation, that the decisions were made after being fully informed and made appropriate strategic choices. We don't have to know precisely what their thought process was because we're supposed to presume that it was correct as long as it's informed. And as we demonstrate in our brief, the issue of the size of the sample and the appropriateness of the testing by the Forensic Science Center was fully litigated prior to trial. There were extensive depositions on this precise point. As we attach to our brief, the deposition of Janine Arvizu, where the defense expert was being deposed and the question was put to her by the state's attorney specifically, do you have any trouble with the decision to go forward based upon the size of the sample? And she said she couldn't find any. The defense was also being advised by Jason Gilder, a well-known DNA expert, as well as the two experts that testified at trial, Dr. Reich and Dr. excuse me, I can't pronounce his name, the other doctor's name. And so clearly the ability and the availability to make these challenges were there. They were not raised. We do not know why, but we have to presume that it was done correctly because what Strickland tells us is that if a counsel makes a decision after having all the information, it must be respected. We cannot do Monday morning quarterbacking with defense attorneys and say, well, you could have done this, you could have done that. It's only when they reach that level of truly deficient representation. And looking at the record in this case, there's no way to reach that conclusion. Not only were these highly skilled attorneys, highly trained attorneys, they left no stone unturned. Everything was litigated. Everything was litigated extensively. Judge Gawne wanted to make sure that this trial was clean. And as you can tell from the size of the record and the issues that are raised, it was an extraordinarily clean trial. And so for that reason, it's not appropriate to be looking at the question of whether or not a Fry hearing would have been granted. The question is whether or not the counsel was ineffective. And as we know from Massaro and from Bew and from Ligon, the cases that we cite in our brief, when we don't know the reason why an attorney didn't do something, an act of omission essentially, it's not appropriate to try and speculate and find ineffective assistance based upon that. It's much more appropriate to wait until a post-conviction petition and allow the attorneys and the defendant to make the claims there. And that's exactly what happened here. We don't know why the defense attorneys didn't file a motion for a Fry hearing. We can speculate, as we do in our brief. We speculate as to why. And the reason why is because looking at the science, looking at the relative fluorescent units, it seems to be well above the stochastic threshold. Even the defense experts or the defense authorities that they rely on recognize that there's two ways of determining an appropriate amount. One is based upon the input, the amplification amount, and the other is based upon the output, the RFUs. And the RFUs, as indicated here, show that bone D was 2.5 and bone C was 1.25 nanograms. Now, counsel says that we're just speculating in that regard, but it's no more speculation than what she's offering in terms of why the attorneys ignored this incredible damaging evidence. The other thing I would point out is the record demonstrates that everyone knew that the samples had been degraded on the bones at the time. Cecilia Doyle testified to that, and she testified at the depositions that degradation would lead to a potentially lower amount. But the kit, the Profiler Plus kit, had a tendency to underestimate the amount of actual DNA that was being inputted. And so it was far more significant to go forward and see what came out. And what came out was an RFU level well above the stochastic threshold. And so for that reason, there's absolutely no basis, and it was certainly a plausible and appropriate decision on behalf of the defense counsels to not go forward with this type of motion. And then the only other point I'd like to make is that even if, even if somehow there had been a Fry hearing which resulted in an exclusion of the DNA evidence, it wouldn't have made a difference in terms of the outcome of this case. This case was truly one of overwhelming evidence. Not only was it the DNA, but it was also the pound print found in the nearly empty garbage can in the Brown's chicken. It was also found in a napkin matching a meal that was sold to what was identified as being the last meal sold because the cash register had been closed and then reopened to sell one four-piece chicken dinner. That was what was found in the garbage can. Not only was the defendant's pound print found in that garbage can, but he also gave an extraordinarily detailed, compelling, videotaped confession to an assistant state attorney. He confessed to the detectives too. And then he, more importantly even than that, he told his friends. He bragged about it. He bragged about it at the time of the crime, within a week, within two weeks. He was proud of what he did. And so it's that evidence altogether. The pound print, the confession, the acknowledgments to his friends, to Ann Lockett and Eileen Bikala, that is the evidence which showed that he is the one who murdered the seven people at the Brown's chicken on January 8, 1993. That he did it with his co-defendant, James DeGorsey, and he did it proudly. And it's for that reason that we would specifically ask that this court affirm Defendant Juan Luna's convictions for murder and allow him to serve out his natural life in the Illinois Department of Corrections. Thank you. Thank you. A few points. First of all, I hardly think that People v. Jennings from 1911, over 100 years ago, was an adequate basis upon which to get judicial notice. It's cited in every case. I know, but it – Maybe it's the line about the monarch's thumb or something. Exactly. Egyptian pharaohs in court – courts in England have used it for hundreds of years without error. I mean, these are totally unsupported conclusions. I mean, I think phrenology was in in those days as well. Excuse me? You're trying to erase it. Yes. Yes, because of the new information that we have, which is, you know, in the briefs, in the record, and also contained in the 2009 NRC report. And as McCown – McCown stands for the proposition that once you have new scientific information about a previously well-accepted methodology, it's time to have a fry hearing on it. And that's the situation that we have here. And in addition, McCown also stands for the proposition that you don't just look to the community of forensic examiners. For example, law enforcement had used HGN for years and said it was very valid and reliable. McCown didn't buy that. They really researched the underlying decisions, they looked at the quality of litigation on this issue, and they looked at the views of dissenting scientists. And based on – based on the lack of – lack of unanimity of decision, remanded for a fry hearing. With regard to the Markham print case from Maryland that Mr. Spellberg talked about, I'd like to note that no actual fry hearing was held in that case. It was just a judicial notice case on the reliability of print identification. And the Illinois Supreme Court has warned that that's a, quote, hollow ritual if all you do is just look at – if all you do is just look at prior judicial decisions. I mean, Illinois started the ball rolling on fingerprint identification. It's really high time that this jurisdiction have its own fry hearing on the admissibility of this highly dubious evidence. With regard to the issues raised, the points made with the DNA, I see – with regard to challenging the DNA, counsel had everything to gain and nothing to lose by raising this type of claim. I mean, the DNA of evidence was persuasive. It's persuasive to juries. Why wouldn't they bring it up? This record here points to one conclusion, that they used substandard amounts of DNA, an issue which never came up at trial, and that the scientific literature establishes all the problems associated with that. I mean, I don't think, based on the state of the record, that you can just conclude that for some unknown reason that he decided not to – that they decided not to raise it. Just two points briefly on – I mean, the state's brief is basically, you know, the amount of DNA here tested was fine based on the RFUs, which is the measurement of the peak heights on the electropharograms. Well, I've cited a couple studies in the reply brief showing that when you're dealing with mixtures, with low copy numbers, I mean, the amount of RFUs is really insignificant. I mean, there's an electropharogram here that shows 4,500 RFUs from a certain peak. Now, does that mean that – tracing it back on the state's chart, that would mean that 10 nanograms of DNA was used to make this sample. That's certainly not the case. Everything here points to low copy number, substandard amounts of DNA. Counsel had everything to gain, nothing to lose by making a motion for a FRI hearing. That's what he should have done. And his failure to do so was an effect of assistance of counsel. Thank you. We'll take it under advisement. We are in recess.